

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

COLONNA'S SHIPYARD, INC.,

      Plaintiff,

v.

          CIVIL ACTION NO. 2:14cv331

UNITED STATES OF AMERICA, through
the DEPARTMENT OF THE NAVY, and its
activity, the NORFOLK SHIP SUPPORT ACTIVITY,

      Defendant.

## *MEMORANDUM OPINION AND ORDER*

This Memorandum Opinion and Order is issued subsequent to a four-day bench trial held in the above-styled matter to resolve claims arising from the alleged breach of a maritime contract. The parties have filed post-trial briefs, and this matter is now ripe for adjudication. The Court issues the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a). For the reasons set forth herein, the Court **AWARDS JUDGMENT FOR DEFENDANT**.

### I. FACTUAL FINDINGS

#### A. Factual History

Plaintiff Colonna's Shipyard, Inc. ("Plaintiff" or "Colonna's") is a private organization engaged in the business of ship repair, which includes repair work undertaken on behalf of the United States Navy. Compl. ¶ 1. This dispute arises from a fixed-price contract[1] (the "Contract") entered into between Colonna's and Defendant United States of America, through the Department of the Navy, and its activity, the Norfolk Ship Support Activity ("Defendant" or

---

[1] A "fixed-price contract" is defined as "[a] contract in which the buyer agrees to pay the seller a definite and predetermined price regardless of increases in the seller's cost or the buyer's ability to acquire the same goods in the market at a lower price." *Fixed-Price Contract*, Black's Law Dictionary (9th ed. 2011).

"United States" or "Navy") on August 17, 2011 for repair work to be undertaken on the USS SQUALL ("SQUALL" or "Vessel"), a public CYCLONE class vessel operating as part of the United States Fleet. Compl. ¶¶ 4, 10, 12. The anticipated repairs required the SQUALL be drydocked, and Colonna's was awarded the Contract in the amount of $7,774,698.00. Compl. ¶ 10. The work Colonna's was required to perform was spelled out in the Contract and accompanying specifications. Compl. ¶ 12. The Contract was a "design-specification" or "build-to-print" contract, which is a "contract requiring the contractor to build a product according to the exact technical specifications provided by the customer . . . the contractor has little discretion in how to perform." *Build-to-Print Contract*, Black's Law Dictionary (9th ed. 2011).

Colonna's alleges that, upon commencement of the work, it encountered numerous changes to its work scope, including, but not limited to, "defective specifications, changed conditions, late, missing or defective Government Furnished Materials or Equipment," Navy requested changes in the scope, effort, means, methods, and performance of Colonna's, and Navy directed accelerations. Compl. ¶¶ 15–16. As a result of these changes, Colonna's claims it had to "expend significantly more in manpower and materials than it had reasonably bid" under the fixed-price Contract. Compl. ¶ 16. After notifying the United States of these expansions, Colonna's states that the "Navy acknowledged only some of the changes and modified the Contract to include some approximately $8.0 million in changes and some 196 days in time extensions." Compl. ¶ 18. In total, the Contract underwent forty-six (46) individual modifications. ECF No. 21 ¶ 24. Colonna's contends that the United States failed to adequately compensate it for a significant amount of these changes. Compl. ¶ 19.

On August 6, 2013, Colonna's submitted a certified Request for Equitable Adjustment

2

("REA") to the Navy seeking an additional $3,894,854.83 in compensation under the Contract based on a "Modified Total Cost" calculation.[2]  Compl. ¶ 21.  Upon reviewing the REA, the Navy concluded that Colonna's was entitled to some relief on four (4) aspects of its request, but that the remaining eight (8) aspects, including Colonna's proposition that the Contract underwent a "cardinal change,"[3] were without merit.  Compl. ¶ 27.  In response to this denial, Colonna's filed the present action.  Compl. ¶ 30.

### B. Procedural History

In its Complaint, Plaintiff seeks the following relief.  Count I is pled in the alternative to the relief sought in Counts II through VI and requests the Court award Colonna's $3,894,854.83 "for the Navy's failure to equitably adjust the Contract as required by its terms as calculated under the Modified Total Cost methodology."  Compl. at 14, ¶ A.  Count II requests the Court award Colonna's $3,883,524.00 "for the Navy's failure to equitably adjust the Contract as required by its terms as calculated under the Item-by-Item methodology."  Compl. at 14, ¶ B. Count III seeks similar relief for work performed under the equitable theory of quantum meruit. Compl. ¶¶ 53–61.  Count IV alleges breach of contract due to the Navy's failure to abide by the Contract's "changes clause" and certain Federal Acquisition Regulations.  Compl. ¶¶ 62–71. Count V alleges breach of duty to disclose superior knowledge prior to entry into the Contract, and Count VI alleges breach of contract under the theory of "cardinal change."  Compl. ¶ 85.

On May 23, 2015, Defendant filed a Motion for Partial Summary Judgment contending

---

[2] A "Modified Total Cost" calculation is the process by which a fixed-price contract is converted into a "cost-plus" contract, which is a "contract in which payment is based on a fixed fee or a percentage added to the actual cost incurred" by the performing party.  *Cost-Plus Contract*, Black's Law Dictionary (9th ed. 2011).

[3] The "Theory of Cardinal Change" or "Cardinal-Change Doctrine" is the "principle that if the government makes a fundamental, unilateral change to a contract beyond the scope of what was originally contemplated, the other party . . . will be released from its obligation to continue work under the contract.  A contractor's allegation of *cardinal change* is essentially an assertion that the government has breached the contract."  *Cardinal-Change Doctrine*, Black's Law Dictionary (9th ed. 2011).

3

that Plaintiff was not entitled to relief on what translated to Counts I, II, and IV of the Complaint. ECF Nos. 17, 18. The Court denied Defendant's Motion for Partial Summary Judgment on July 7, 2015, finding that there were genuine issues of material fact that precluded a grant of summary judgment. ECF No. 37. Accordingly, on July 14, 2015 this matter proceeded to trial on each of the grounds for relief asserted in Plaintiff's Complaint.

**C. Stipulated Facts**

The parties have stipulated to the following facts, which the Court accepts and finds:

1. Colonna's is a Virginia corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Norfolk, VA, U.S.A.

2. Colonna's performs ship repair work for commercial customers and for the United States Government, including the U.S. Navy.

3.  Defendant has issued a Contracting Officer's Final Decision denying Colonna's REA for vessel repairs.

4. The subject of this dispute arises from a contract between the Navy and Colonna's under contract number N50054-11-C-1106 (hereinafter the "Contract") for certain ship repair work upon the SQUALL.

5. The SQUALL is a U.S. Navy Patrol Coastal Ship of the CYCLONE class and is a public vessel of the United States being operated by the Navy as part of the United States Fleet. The SQUALL has been homeported and forward deployed at Naval Support Activity Bahrain since July 3, 2013 but was previously homeported in, and the repair work at issue was completed in, Norfolk, Virginia, within the Eastern District of Virginia.

6. The US Navy built the CYCLONE class of patrol craft, including the SQUALL (PC-7), in the early 1990s as support craft for the SEAL teams.

7. As the repairs to accomplish the overhauls of the CYCLONE class ships were identified and specifications were written, an initial contract for the overhaul of the SQUALL was finalized between the Navy and BAE Systems. The disassembly of the SQUALL's equipment and systems was begun, and the parts were stored, by BAE.

8. When difficulties with the prosecution of the overhaul of the SQUALL made BAE's performance untenable, the Navy terminated the contract for convenience and compensated BAE for the work it had done.

9. This is a Contract Disputes Act claim for a maritime matter, i.e. a ship repair issue, and as such is brought pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101, et seq. arising from a contract between Colonna's and the United States.

10. This is also an admiralty and maritime claim brought pursuant to the Suits in Admiralty Act, 46 U.S.C. § 30901, et seq., the Public Vessels Act, 46 U.S.C. § 31101, et seq., in accordance with Section 41 U.S.C. § 7102(d), "Maritime Contracts," of the Contracts Disputes Act of 1978. This is also an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

11. Pursuant to the Contract Disputes Act of 1978, sections 7102(d) and 7104(b), this matter was properly brought in this Court.

12. The SQUALL was located within the Eastern District of Virginia (hereinafter this "District") when the work in question was performed. Colonna's resides and has its principal place of business with this District; the Contract in question was executed by the Defendant within this District, and the Defendant also has facilities and does work in this District. Venue is proper within this District.

13. In the spring of 2011, the Navy solicited another contract to complete the overhaul of the

SQUALL begun by BAE. The solicitation sought fixed-price bids for the specified repairs and advised potential bidders that the ship had been partially disassembled, with many parts in storage.

14. Colonna's prepared and submitted its quote for the SQUALL work and contract, relying on the information the Navy made available during the proposal phase regarding the scope of the work to be performed.

15. Colonna's was one of three bidders and won the contract with its offer to accomplish the overhaul for $7,774,698.00.

16. The contract between Colonna's and the Navy to complete the overhaul of the SQUALL was awarded on August 17, 2011 and assigned Contract No. N50054-11-C-1 106 for the Emergent Availability with Drydocking for the SQUALL.

17. The Contract was awarded at Colonna's bid price of $7,774,698.00.

18. Among the work to be performed were certain repairs, including the cropping out and replacement of the SQUALL's hull structure, plate, and stiffeners, which such work was to be performed while the Vessel was docked/hauled at Colonna's.

19. The single line item of the Contract, CLIN 1, required Colonna's to:

> Prepare for and accomplish the drydocking restricted availability (DRAV) of USS SQUALL (PC-7) as delineated in Specification Package # 037-11, including addendum one and errata one, and as specified herein and in accordance with standard items, work item specifications, drawings, test procedures and other detailed data provided by the government in accordance with Section J.

20. Specification Package #037-11 listed fifty-seven (57) Navy Standard Items that were explicitly incorporated into the Contract, named fifty-seven (57) more Standard Items that might be invoked as changes were made to the Contract, then described the "Planned Work" of the overhaul in forty-eight (48) "Work Items" that specified the exact work to

be done on the Vessel.

21. The initial schedule under which the work was to be accomplished was specified in the Contract as a series of milestones. The SQUALL's crew was to move ashore on September 12, 2011, the date that the ship was delivered to Colonna's. The last milestone was the completion of sea trials, which was to be accomplished no later than June 8, 2012. The initial performance period of the Contract was, therefore, two-hundred seventy (270) days.

22. The "Changes" clause incorporated into this Contract, FAR 52.243-1 (Alt II–Aug 1987), provides that: "(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract."

23. As the overhaul of the SQUALL progressed, plans and procedures for the work detailed in the Specification Package caused delays and new "growth" work was added to the package. As these new requirements arose, Colonna's and the Navy negotiated a series of forty-six (46) Contract Modifications.

24. After forty-six (46) Modifications, the current price of the Contract is $16,504,722.65, and the final completion date was March 15, 2013. The full performance period was, therefore, extended by two-hundred eighty (280) days, totaling five-hundred fifty (550) days.

25. The SQUALL was delivered on March 15, 2013, the as-amended redelivery date, and Colonna's has not claimed additional delay costs nor has the Navy claimed any damages for delay.

7

26. On August 6, 2013, Colonna's submitted its properly certified REA to the Navy seeking further adjustment of and compensation for the changes to the work scope and means and methods of performance on the SQUALL and under the Contract.

27. On or about May 5, 2014, the Navy issued its Final Decision by letter Serial 414/133. The Navy's Final Decision states that it "finds that there is some entitlement on four aspects (f, h, j, and k) of your claim within Section III, but the remaining eight aspects of your claim under Section III, (a) through (l) are not valid and consequently denied." The Final Decision also noted that "[t]he remaining aspects of your claim under Section III, (m) through (p), and the Theory of a Cardinal Change are determined to be without merit and subsequently denied as well."

28. The Contracting Officer made no explicit, quantified settlement offer in the Final Decision for the four (4) items on which the Navy acknowledged some entitlement.

29. The Final Decision also provided notice to Colonna's of its right to appeal the Final Decision.

30. On or about July 1, 2014, Colonna's filed this timely appeal of the Contracting Officer's Final Decision in the United States District Court for the Eastern District of Virginia, Norfolk Division.

31. The parties have subsequently conducted written discovery, taken the depositions of some eighteen (18) individuals, and engaged in mediation in this matter before former U.S. Magistrate Judge F. Bradford Stillman.   The mediation was unsuccessful at resolving this dispute.

32. At trial, the parties stipulated that Colonna's labor rate was $46.65 per hour for straight time and $69.97 per hour (an additional $23.32 per hour) for overtime.

33. The parties also stipulated that four (4) of the Items contained in the original REA, Pl.'s
Ex. 1, were now settled as to hard-core costs and would not be a part of the trial as to the
direct costs of those efforts. Accordingly, the Court need not address the direct costs of
Item F, Strut Bolts; Item H, Unacceptable Answers to Condition Reports; Item J, Added
Weekly Flag Briefing, and Item K, Government Furnished Materials – Conex boxes. The
settled amounts will be paid outside of and separately from this lawsuit.

**D. Additional Factual Findings**

The Court has made the following additional factual findings:

1. Navy Standard Item 009-07 requires that no more than a single firewatch attend four (4)
hotworkers, that each firewatch have a "clear view of and immediate access to each
worker accomplishing hot work," that hotworkers must be posted in each blind area, and
that hotworkers be posted on each side of a deck or bulkhead. J. Ex. 53 at 5.

2. Colonna's bid firewatch at a ratio of one (1) firewatch to three (3) hotworkers, and the
Navy requested firewatch in excess of the hours Colonna's anticipated in its bid. Trial
Tr. Vol. 1, 111: 15–18, July 14, 2015; Tr. Vol. 3, 456: 10–23, 556: 10–12, July 16, 2015.

3. Due to the small compartments located on the SQUALL, occasionally a single firewatch
was required to monitor a single hotworker. Tr. Vol. 3, 473: 20–25, 474: 1–16.

4. The SQUALL's engines were not removed as interference such that a physical engine to
transmission alignment would have been required under Work Item 110-11-004,
paragraph 3.2.2. Trial Tr. Vol. 4, 609: 21–25, 610: 1, July 20, 2015.

5. Navy Work Item 110-11-004, paragraph 3.7, required the contractor to perform a
physical engine to transmission alignment in order to install a new Pourable Epoxy Resin
Chocking System. J. Ex. 55 at 5; Tr. Vol. 4, 592: 13–22.

6. Navy Standard Item 009-67 requires contractors to develop an Integrated Test Plan ("ITP") when the overhaul is considered "complex" or performed on a "combatant." Pl.'s Ex. 66 at 2; Tr. Vol. 1, 146: 7–19; J. Ex. 62 ¶¶ 3.1–3.2.

7. The SQUALL was designated as a Drydocking Restricted Availability ("DRAV") and not a Complex Overhaul ("COH"). J. Ex. 3 at 2; Tr. Vol. 4, 643: 16–25.

8. Throughout the SQUALL availability, the Navy Maintenance Database had not been updated to reflect the then current Navy Standard Items. Trial Tr. Vol. 2, 262: 12–25, July 15, 2015; Pl.'s Ex. 59.

9. Excessive grinding of welds damages the welds' integrity and is not required under the Contract. Tr. Vol. 4, 753: 13–23; Tr. Vol. 2, 334: 3–6.

10. The Navy's Quality Assurance inspector, Mr. Buford Redd, did not require Colonna's to grind welds to a "smooth" or "shiny" finish in order to pass inspection. Tr. Vol. 4, 748: 5–10; Tr. Vol. 4, 748: 22–25, 749: 1–2.

11. Quality Assurance ("QA") tickets were generated for every weld Mr. Redd inspected. Tr. Vol. 3, 470: 7–9, 491: 16–20; Tr. Vol. 3, 492: 2–4, 13–21.

12. In an effort to "sell the welds," Colonna's inferred that the welds needed to be ground smooth and to a shiny finish and ground the welds on its own accord. Tr. Vol. 2, 425: 25, 426: 1–5; Tr. Vol. 3, 484: 5–10.

13. The Navy was contractually permitted to require either Liquid Dye Penetrant Testing ("PT") or Magnetic Particle Testing ("MT") to measure the quality of the welds. Tr. Vol. 1, 163: 11–18; J. Ex. 64 at 2.

14. Colonna's omitted overtime in its bid in order to keep its bid low and win the Contract. Tr. Vol. 2, 245: 23–26, 246: 1–2.

10

15. Plaintiff reserved the right to seek damages for "cumulative impact" in Modifications twenty-six (26) to forty-six (46). J. Ex. 38–48; J. Ex. 40 at 3.

16. Plaintiff's welding supervisor, Mr. Nelson Britt, testified that it takes fifteen (15) to twenty (20) minutes to grind one (1) foot of weld. Tr. Vol. 2, 422: 4–6.

17. In its REA, Colonna's requested compensation for excessive weld grinding at a rate of one (1) manhour of grinding per one (1) foot of weld. Pl.'s Ex. 1 at 41.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

1. This Court has subject matter jurisdiction in accordance with 41 U.S.C. § 7102(d) of the Contract Disputes Act of 1978, which stipulates that appeals of an agency board's decision under 41 U.S.C. § 7107 arising out of maritime contracts are governed by the Suits in Admiralty Act, 46 U.S.C. § 30901, et seq.

2. This is also an admiralty and maritime claim within the meaning of Federal Rule of Civil Procedure 9(h), as a contract to repair a ship is considered a maritime contract. *New Bedford Dry Dock Co. v. Purdy (The Jack-O-Lantern)*, 258 U.S. 96, 99 (1922); *see also Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961).

### B. Applicable Law

1. The Suits in Admiralty Act governs civil actions, which "shall proceed and be heard and determined according to the principles of law and the rules of practice applicable in like cases between private parties." 46 U.S.C. § 30907(a).

2. If a contract is considered maritime, admiralty law controls the contract's interpretation unless the dispute is "inherently local." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 22–23 (2004).

11

3. "[I]n an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point." *Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998). Although state law may serve to supplement federal maritime law, maritime law controls if the two conflict. *Wells v. Libby*, 186 F.3d 505, 524–25 (4th Cir. 1999) (quoting *Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063, 1065 n.5 (5th Cir. 1981)).

4. "The credibility of the witnesses, and in turn the weight of the evidence, is not determined by the mere number of witnesses testifying to the existence or nonexistence of any fact. The testimony of a small number of witnesses to any one fact may be considered more credible than the testimony of a large number of witnesses to the contrary." 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions*, § 105:01 (6th ed. 2011).

5. Plaintiff "must prove by a preponderance of the evidence that a legally enforceable obligation existed between it and the defendant; that the defendant breached that obligation; and that the plaintiff incurred damages as a result of the breach." *Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia*, 715 F.3d 501, 517 (4th Cir. 2013).

6. In admiralty, a plaintiff must prove by the preponderance of the evidence that it suffered damages resulting from Defendant's breach of contract in violation of maritime law. *CMA CGM S.A. v. Deckwell Sky (USA) Inc.*, 91 F. Supp. 3d 841, 846 (E.D. Va. 2015).

## C. Breach of Contract

1. "When no federal statute or well-established rule of admiralty exists, admiralty law may look to the common law or to state law, either statutory or decisional, to supply the rule of decision." *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 834 (4th Cir. 1998)

12

(citing *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981)).

2. "[A]mbiguous clauses are interpreted under maritime law, not state law," with the contractual language strongly construed against the drafter. *Dann Marine Towing LC v. Gen. Ship Repair Corp.*, 31 F. Supp. 3d 743, 746 (D. Md. 2014) (quoting *Edward Leasing Corp. v. Uhlig & Associates, Inc.*, 785 F.2d 877, 888–89 (11th Cir. 1986)); *see also Murr v. Captial One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 586 (E.D. Va. 2014).

3. If a contractual term is expressed with such uncertainty and inexactitude "that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect," then "it may be read in the light of surrounding circumstances, and if, reading it thus, its meaning may be gathered, the same will be enforced." *Smith v. Farrell*, 98 S.E.2d 3, 7 (Va. 1957) (quoting 4 M.J., Contracts § 27, 359).

4. In interpreting a maritime contact, the long established "elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them." *O'Brien v. Miller*, 168 U.S. 287, 297 (1897); *see also Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (stating that under Virginia law, "a court should read the contract as a single document and give meaning to every clause where possible") (citing *Berry v. Klinger,* 300 S.E.2d 792, 796 (Va. 1983)).

5. If, on the whole, the parties "assent to the same thing in the same sense, and their minds [ ] meet," the Court will enforce a valid agreement. *Id.* (quoting 17 C.J.S., Contracts, § 31, 359).

6. Contracts to repair or perform extensive reconstruction of a ship fall within the Court's

admiralty jurisdiction. *New Bedford*, 258 U.S. at 99.

7. "Under Virginia Law, a breach of contract requires (1) a legally enforceable obligation, (2) the defendant's material breach of that obligation, and (3) damage to the plaintiff caused by the breach of that obligation." *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1086 (E.D. Va. 2011) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

8. In Virginia, contractual words and terms "must be given their ordinary and usual meaning," *Murr*, 28 F. Supp. 3d at 586 (citing *Management Enters., Inc. v. Thorncroft Co., Inc.*, 416 S.E.2d 229, 231 (Va. 1992)), and "[i]nterpretation of a maritime contract's terms is a matter of law." *Dann Marine Towing*, 31 F. Supp. 3d at 746 (quoting *In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d 851, 858 (8th Cir. 2010)).

9. The Court is permitted to consider extrinsic evidence to uncover the intent of the parties when the contractual term at issue is considered "ambiguous," that is, capable of two or more reasonable meanings. *Silicon Image, Inc. v. Genesis Microchip, Inc.*, 271 F. Supp. 2d 840, 850 (E.D. Va. 2003); *see also Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000).

10. Damages for breach of contract are intended to return the aggrieved party to the position it would have been absent the breach and are limited to pecuniary loss. *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 156 (Va. 2009). Failure to show proof of damages warrants dismissal of the applicable claim. *Id.*

*Modified Total Cost Approach to Damages Calculation*

11. When a party seeks relief utilizing the "modified total cost method" to calculate damages, it seeks "the total actual costs incurred in performing the contract minus the contractor's

bid price or estimated costs." *Youngdale & Sons Constr. Co., Inc. v. United States*, 27 Fed. Cl. 516, 541 (Fed. Cl. 1993).

12. Use of the modified total cost method is only condoned "in those extraordinary circumstances where no other way to compute damages [ ] [is] feasible and where the trial court employ[ ][s] proper safeguards." *Youngdale*, 27 Fed. Cl. at 541 (quoting *Servidone Const. Corp. v. United States*, 931 F.2d 860, 862 (Fed. Cir. 1991)).

13. "Use of this method is highly disfavored by the courts, because it blandly *assumes*—that every penney [sic] of the plaintiff's costs are *prima facie* reasonable, that the bid was accurately and reasonably computed, and that the plaintiff is not responsible for any increases in cost." *Id.*; *see also Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 419 (Fed. Cl. 2001) (stating that "the total cost method is highly disfavored.").

14. "A party seeking to employ this method must be able to demonstrate: '(1) the impracticability of proving actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) the lack of responsibility for the added costs.'" *Servidone*, 931 F.2d at 861.

*Item-by-Item or "Bottom-up" Approach to Damages Calculation*

15. In employing the traditional "bottom-up" approach to calculating damages, a contractor will analyze the damages incurred on each individual consideration and then add up each individual item's damages "to reach a true total of damages." *Stender v. Archstone-Smith Operating Trust*, No. 07cv02503, 2015 WL 5675304, at *10 (D. Colo. Sept. 28, 2015).

16. A contractor is generally not entitled to utilize a "total cost" or "modified total cost" methodology if damages can be calculated under the traditional "bottom-up" or "item-by-item" approach. *See generally*, *Youngdale*, 27 Fed. Cl. at 541.

**D. Theory of Cardinal Change**

1. The Theory of Cardinal Change "asks whether a modification exceeds the scope of the contract's changes clause;" more specifically,

> [u]nder established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

   *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993) (quoting *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563–64 (Fed. Cl. 1978)).

2. Modifications are considered to fall within a contract's changes clause "if potential bidders would have expected it to fall within the contract's changes clause" prior to award. *Id.*

3. In order to demonstrate cardinal change, Plaintiff must establish the following features: "(1) a cardinal change requires work materially different from that specified in the contract, and (2) a cardinal change amounts to an actual breach of contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).

**E. Quantum Meruit**

1. In admiralty, maritime law governs quantum meruit claims, but if there is no applicable maritime law on point, common law controls. *See generally, Constantino v. American S/T Achilles*, 580 F.2d 121, 122 (4th Cir. 1978).

2. "To avoid unjust enrichment, equity will effect a 'contract implied in law,' requiring one who accepts and receives the services of another to make reasonable compensation for those services." *Po River Water and Sewer v. Indian Acres Club*, 495 S.E.2d 478, 482 (Va. 1998).

16

3.  To prevail on a claim of quantum meriut, Plaintiff must generally show the following: "(1) A benefit conferred on the defendant by the plaintiff; (2) Knowledge on the part of the defendant of the conferring of the benefit; and (3) Acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Nossen v. Hoy*, 750 F. Supp. 740, 744–45 (E.D. Va. 1990); *see also Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Copr.*, 961 F.2d 489, 493 (4th Cir. 1992).

4.  "The existence of an express contract on the subject in question would impair attempts to establish" the right to recovery under the theory of quantum meruit. *Raymond*, 961 F.2d at 493.

**F. Duty to Disclose Superior Knowledge (Actual or Constructive Fraud)[4]**

1.  "[T]he duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Chiarella v. United States*, 445 U.S. 222, 229 (1980) (quoting Restatement (Second) of Torts § 551(2)(a) (Am. Law Inst. 1976)).

2.  Failure to disclose material information when a party is under a duty to do so constitutes common law fraud. *Chiarella*, 445 U.S. at 228. "A cause of action for actual fraud requires the plaintiff to plead and prove: '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 581 (Va. 2003).

3.  "[W]here a party lacks the intent to conceal a material fact, but the party had a duty to

---

[4] It is unclear from the pleadings whether Plaintiff is alleging a claim for actual or constructive fraud as a result of Defendant's alleged breach of its duty to disclose superior knowledge. *See* Compl. ¶¶ 72–81.

disclose information and its failure to disclose causes damage to one reasonably relying upon that omission," this concealment may constitute "constructive fraud." *Noell Crane Systems GmbH v. Noell Crane and Service, Inc.*, 677 F. Supp. 2d 852, 871 (E.D. Va. 2009) (citing *Cohn*, 585 S.E.2d at 578).

4. "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it." *Nationwide Mut. Ins. Co. v. Hargraves*, 405 S.E.2d 848, 851 (Va. 1991).

### III. DISCUSSION

Based on the evidence presented at trial and the parties' post-trial briefs, the Court must resolve two questions: (1) Did the United States breach its Contract with Colonna's, and if so, (2) to what extent is Colonna's entitled to damages?

### A. Counts I, II, IV, and VI – Breach of Contract

Plaintiff contends that Defendant failed to adjust properly the Contract following certain Navy directed changes altering the Contract's terms. ECF No. 54 at 22. While Count IV asserts a traditional breach of contract claim, Counts I, II, and VI of the Complaint *assume* the Government has breached the Contract and set forth alternative theories of recovery: (1) The Modified Total Cost Approach; (2) the Item-by-Item (Bottom-up Approach); and (3) the Theory of Cardinal Change. Accordingly, the Court must primarily determine whether Plaintiff has shown by a preponderance of the evidence that Defendant materially breached the Contract. Plaintiff argues that the Navy did so in each of the following ways.

#### i. Additional Firewatch Hours

At trial, one of Colonna's primary claims for recovery was the alleged excessive

firewatch[5] hours expended throughout the SQUALL availability. Colonna's frequently reiterated that Navy Standard Item 009-07 required that a single firewatch attend no more than four (4) hotworkers, Tr. Vol. 1, 111: 20–22; Tr. Vol. 2, 287: 19–22; see J. Ex. 53, and that Colonna's bid firewatch at a ratio of one (1) firewatch to three (3) hotworkers. Tr. Vol. 1, 111: 15–19; J. Ex. 50. Colonna's argues that it expended nearly seven (7) times more firewatch than it bid and that 50% of the additional hours expended resulted from the Navy unreasonably requiring more firewatch than necessary under Standard Item 009-07. *See* Pl.'s Exs. 24, 25; Tr. Vol. 1, 123: 1–8; ECF No. 54 at 6. However, Standard Item 009-07's requirement that no more than a single firewatch attend four (4) hotworkers is merely a maximum threshold, and the Standard Item primarily requires that each firewatch have a "clear view of and immediate access to each worker accomplishing hot work." J. Ex. 53 at 5. For example, if a firewatch assigned to watch three (3) hotworkers found his view of the leftmost hotworker obstructed, an additional firewatch would be required to watch the leftmost hotworker at a potential 1:1 ratio.

The Standard Item further specifies that hotworkers be posted on each side of a bulkhead or deck and must be posted simultaneously in each blind area. J. Ex. 53 at 5. Accordingly, it is not enough for Colonna's to argue that by virtue of expending a higher ratio of firewatch hours than minimally required by Standard Item 009-07 the Navy was unreasonably requiring firewatch *beyond* the specifications. In order to recover for breach of contract, Colonna's needs to show by a preponderance of the evidence that the additional firewatch expended were both demanded by the Navy *and* not required under Standard Item 009-07. At trial, Colonna's came forth with evidence sufficient to show that the Navy requested firewatch in excess of the hours anticipated by Colonna's in its bid, see Tr. Vol. 2, 286: 10–13; Tr. Vol. 2, 325: 2–20, 326: 1–7;

---

[5] A firewatch is a worker assigned to stand by and monitor fellow workers performing "hot work," i.e., any burning, welding, grinding or spark-producing process, to ensure those sparks do not cause a fire. Tr. Vol. 1, 110: 25, 111:1.

Tr. Vol. 3, 451: 11–25; Tr. Vol. 3, 543: 24–25, 544: 1–22; however, Colonna's did not present evidence sufficient to show that the Navy did so in violation of the Contract.

Colonna's was unable to show that the additional firewatch the Navy required were unnecessary to ensure compliance with Standard Item 009-07. The evidence indicated that the SQUALL required welders to work in compact compartments where a single firewatch was required to monitor a single hotworker. Tr. Vol. 3, 473: 20–25, 474: 1–16. Evidence further indicated that because firewatch must be posted on the opposite side of a bulkhead or deck on which hotwork is performed, six (6) hours of hotwork could conceivably require twelve (12) hours of firewatch, a 1:2 ratio of hotwork to firewatch. Tr. Vol. 3, 468: 7–10; Tr. Vol. 4, 584: 13–19. Colonna's cannot show with any degree of certainty that the firewatch hours it claims the Navy unreasonably required were required in violation of Navy Standard Item 009-07. Accordingly, the Court finds that merely requiring more firewatch than Colonna's reasonably anticipated in its bid does not in itself constitute a breach of contract under Virginia law. Plaintiff has not met its burden of proof.

### ii. Engine to Transmission Alignment

Colonna's contends that the Navy's refusal to fund the physical engine alignment Colonna's performed during the SQUALL availability amounted to a breach of contract. ECF No. 54 at 6; Pl.'s Ex. 1 at 23. The crux of this dispute is a disagreement over the interpretation of Work Item 110-11-004, paragraph 3.7, which reads, "[a]ccomplish the *optical alignment* of the Main Propulsion Diesel Engines, Transmissions and Shafts in accordance with 2.38 through 2.49 including removal and installation of new Pourable Epoxy Resin Chocking System." J. Ex. 55 at 5 (emphasis added). The United States conceded that the engines were not removed as interference such that a physical alignment of the engines was required under paragraph 3.2.2,

but it argued that the remaining specifications referenced in paragraph 3.7 required Colonna's nonetheless "accomplish a physical alignment" of the engines. Tr. Vol. 4, 609: 21–25, 610: 1; Tr. Vol. 4, 594: 19–22.

In interpreting a maritime contract, the Court reads the contract as a whole, giving meaning to each clause so as to decipher the intent of the parties. *See O'Brien*, 168 U.S. at 297. If the Court finds the disputed contractual language to be ambiguous, the principle of *contra proferentum* provides that such ambiguities are construed against the drafter. *See Dann Marine Towing*, 31 F. Supp. 3d at 746 (quoting *Edward Leasing Corp.*, 785 F.2d at 888–89). However, the principle of *contra proferentum* is premised upon there being a term expressed with such uncertainty and inexactitude "that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect." *Smith*, 98 S.E.2d at 7 (quoting 4 M.J., Contracts § 27, 359). "[W]here a contract is to some extent uncertain and ambiguous, it may be read in the light of surrounding circumstances, and if, reading it thus, its meaning may be gathered, the same will be enforced." *Id.* (quoting 4 M.J., Contracts § 27, 359). If, on the whole, the parties "assent to the same thing in the same sense, and their minds [ ] meet," the Court will enforce a valid agreement. *Id.* (quoting 17 C.J.S., Contracts, § 31, 359).

Colonna's argues that its interpretation of the Contract supports its position that a physical engine to transmission alignment was not required. ECF No. 54 at 7. It further argues that if the Court determines that the Contract language is ambiguous, the contractor's interpretation of the language is evaluated under a "reasonableness" standard, that is, the contractor's position should be accepted if it is in the "zone of reasonableness." *Id.* at 8. However, the Court finds that when interpreted under the Contract as a whole, the meaning of paragraph 3.7 can be ascertained, and that the language referenced therein required the contractor

to bid a physical engine to transmission alignment when it submitted its fixed-price proposal. Therefore, by accepting Colonna's fixed-price bid, the United States sufficiently compensated Colonna's for the physical engine to transmission alignment performed.

To ascertain the proper meaning of a contract, it must be read in its entirety to include all references. *Hitachi Credit America Corp.*, 166 F.3d at 624. In construing paragraph 3.7, Plaintiff has ignored the references to sections 2.38 through 2.49. The clear requirements of sections 2.38 through 2.49 include twelve (12) references set forth in Work Item 110-11-004, which control the contractual requirement of alignment. *See* Def.'s Ex. 9. These references are an active part of the Contract specifications. *See* J. Ex. 1 at 9. From these references, it is apparent that performing an optical alignment may require the contractor to perform a physical alignment of the engines, that is, to move them so that they are properly optically aligned. In fact, these references refer to Plaintiff's performance of a "final alignment," not an "optical alignment." J. Ex. 1 at 9.

Further, paragraph 3.7 specifically includes language requiring the "removal and installation of new Pourable Epoxy Resin Chocking System." J. Ex. 55 at 5. In an email sent to Colonna's during the availability, the Navy reiterated that the contractor was contractually required to break the "Chockfast" on the main struts to achieve alignment. Pl.'s Ex. 48. Mr. Winford Kenny Rice, the Navy's Contracting Officer assigned to the SQUALL, clarified that this "[c]hocking system is kind of a hard plastic resin that the engine sat on, and the contractor is required to remove this resin system whenever they are removing the engines and reinstall it." Tr. Vol. 4, 592: 13–16. It was explained that removal and installation of the chocking system only occurs when the contractor is in the process of physically aligning the engine, at which point the contractor is required to pour the Chockfast quickly to reinstall it. Tr. Vol. 4, 592: 17–

22

22. Accordingly, the language in paragraph 3.7 necessitating "removal and installation of new Pourable Epoxy Resin Chocking System" required Colonna's to perform a physical engine to transmission alignment as a prerequisite to accomplishing this task.

Colonna's also argues that it did not include the cost of a physical alignment in its bid "because it did not know nor could it have known that such a task would be required." ECF No. 54 at 6; Tr. Vol. 1, 136: 7–13. Accordingly, Plaintiff argues that at the time of contract, the parties' minds did not meet on this issue. The Court is permitted to consider extrinsic evidence to uncover the intent of the parties when the contractual term at issue is considered "ambiguous," that is, capable of two or more reasonable meanings. *Silicon Image*, 271 F. Supp. 2d at 850; *see also Providence Square Assocs.*, 211 F.3d at 850. Evidence indicates that Colonna's was forewarned during the bidding process that physical alignment of the engines may have been required pursuant to a bidder's question submitted to the Government prior to award. Def.'s Ex. 4. During the bidding process, Colonna's asked whether physical alignment of the engine components may be required, and the Government confirmed that a physical engine-to-transmission alignment may be required under the applicable specifications. *Id.*

Prior to final approval of the Contract, the Government also required Colonna's to correct its Process Control Procedure ("PCP") to reflect that an "alignment" was required as opposed to simply an "optical alignment." J. Ex. 1 at 9. In Colonna's progress report dated September 20, 2011, Colonna's listed on the timeline of work scheduled under Work Item 110-11-004 Colonna's plan to "align main engines" following their physical removal and reinstallation. Def.'s Ex. 5 at 7. If the engines have to be moved, such as to replace components surrounding the engines, a physical alignment necessarily follows upon reinstallation. *See* Tr. Vol. 1, 136: 7–24, 137: 7–15; Tr. Vol. 2, 280: 7–10. Although Colonna's contends, and the Government

23

concedes, that the engines were not removed as "interference," given Plaintiff's experience in the ship repair industry it should have understood that it may have been necessary to do a physical engine to transmission alignment when it bid the Contract.

Colonna's interpretation suggesting that paragraph 3.7 did not require a physical engine to transmission alignment was not reasonable when read under the whole Contract and in light of the evidence before the Court. Colonna's bid was required to include the task and price of performing a physical engine to transmission alignment, and the Court finds that if Plaintiff excluded such costs in its bid price prior to entry of its bid, such exclusion was a means of lowering its overall costs to increase its chances of winning the contract. *See* Tr. Vol. 1, 189: 12–25; Tr. Vol. 4: 590: 22–25, 591: 1–8. When Colonna's submitted a Conditions Found Report ("CFR") seeking compensation for physical alignment of the engine components, the Court finds that Defendant properly refused to compensate Plaintiff on the ground that the physical alignment was a part of the fixed-price contractual base work and thus required no additional compensation. *See* J. Exs. 59, 61. Accordingly, Defendant's actions in this matter did not constitute a breach of contract under Virginia law. Plaintiff's claim fails.

### iii. Corrective Action Reports

The Navy files Corrective Action Reports ("CARs") when an alleged violation of the Contract has occurred. Tr. Vol. 1, 141: 7–17. Colonna's contends that of the twenty-six (26) CARs the Navy issued during the SQUALL availability, eight (8) were issued improperly. Tr. Vol. 2, 283: 2–7; Pl.'s Ex. 1 at 27–28. Plaintiff asserts that the Navy was using the CAR process to threaten Colonna's whenever an issue of contract interpretation arose. Tr. Vol. 1, 141: 11–25, 142: 10–13; ECF No. 54 at 15. Plaintiff claims it is owed $8,957.00 for the manhours expended reading, researching, evaluating, answering, and discussing the CARs. *See* Pl.'s Ex. 1 at 29.

Defendant counters that CARs are written to address any issue of noncompliance, and Colonna's has pointed to nothing but the testimony of its Vice President, Mr. Sobocinski, to support its contention that these eight (8) CARs were utilized as a means of threatening Plaintiff. Tr. Vol. 4, 599: 1–6, 11–15; ECF No. 53 at 12. The Court finds that Colonna's did not establish by a preponderance of evidence that each of the eight (8) CARs it claims were improperly issued were done so in violation of the Contract's terms or provisions. Plaintiff has not established that Defendant's actions in this matter constituted a breach of contract under Virginia law and cannot prevail on this part of its claim.

### iv. Integrated Test Plan

Colonna's alleges that the Navy required it to develop and administer an Integrated Test Plan ("ITP") that could not have been reasonably anticipated under the Contract. Pl.'s Ex. 1 at 31–31; Tr. Vol. 1, 149: 13–16. Navy Standard Item 009-67 sets forth the overhauls that require an ITP, and the parties agree that an ITP is required if an overhaul is considered "complex" or performed on a "combatant." Tr. Vol. 1, 146: 11–19; Tr. Vol. 4, 636: 9–19, 637: 5–8; Pl.'s Ex. 66 at 2; J. Ex. 62 ¶¶ 3.1–3.2; ECF No. 53 at 13. Colonna's argues that the SQUALL overhaul was neither complex nor was the Vessel categorized as a combatant. Tr. Vol. 1, 147: 12–17, 25; 148: 1–2. The Navy's contracting officer, Mr. Rice, admitted that the SQUALL was designated as a Drydocking Restricted Availability ("DRAV") and not a Complex Overhaul ("COH"). Tr. Vol. 4, 643: 16–25. However, the parties disagree as to whether these designations are mutually exclusive. The Government contends that just because the SQUALL was not designated as a COH does not mean the overhaul was not "complex." Tr. Vol. 4, 643: 16–19. It further argues that because the SQUALL "had a gun," it was considered a "combatant." Tr. Vol. 4, 644: 1–11.

Colonna's attempted to shift the burden to Defendant in this matter, claiming that the

Navy presented no evidence at trial that the SQUALL was either a COH or combatant. ECF No. 54 at 16. The burden, however, is on Colonna's to show that the SQUALL was neither a COH nor a combatant. The only evidence admitted in this matter was the testimony of Mr. Sobocinski, who merely claimed that the overhaul was not complex and the SQUALL was not a combatant. *See* Tr. Vol. 1, 147: 12–17, 25; 148: 1–2. Mr. Rice contradicted these claims, Tr. Vol. 4, 643: 16–19, 644: 1–11, and the Court was presented with no practical evidence upon which it could determine whether by designating the SQUALL as a DRAV availability it precluded a COH designation. Further, the Court was presented with no evidence upon which it could determine whether the SQUALL was considered a "combatant." Accordingly, Plaintiff has not met its burden of proof on this claim to establish that Defendant's ITP requirements constituted a breach of contract under Virginia law. Plaintiff cannot prevail on this claim.

### v. Navy Maintenance Database

Navy Standard Item 009-60 requires contractors to submit reports online using the Naval Maintenance Database ("NMD"). Tr. Vol. 1, 152: 1–10. The NMD had not been updated to reflect the Navy Standard Items employed during the SQUALL availability. Tr. Vol. 1, 152: 11–18; Pl.'s Ex. 59. Colonna's claims that because it was forced to submit hand-written documents and take the time to cross-reference the current Standard Items with those listed in the NMD, it is owed damages in the amount of $10,217.00. *See* Tr. Vol. 1, 152: 22–25, 153: 1–8; Pl.'s Ex. 1 at 34. The Navy's contracting officer, Mr. Rice, testified that during the availability he recalled speaking with a Colonna's representative about the issues presented with the NMD. Tr. Vol. 4, 604: 17–24. He stated that he informed Colonna's that if it could not perform a certain task to submit a CFR to the maintenance team, and the maintenance team could direct Colonna's to perform alternatives. Tr. Vol. 4, 604: 19–21.

Ultimately, the Navy issued a CAR related to this issue, claiming that Colonna's had not properly complied with Standard Item 009-60. Pl.'s Ex. 59. In resolving this dispute, the Navy informed Colonna's that it was "downgrading this CAR to a minor CAR (Method A), since NSSA [Norfolk Ship Support Activity] recognizes that the Government affected the contractor's ability to comply with the requirements," but also stated that "[i]f Colonna's is unable to comply with requirements . . . a CFR or email . . . will be expected to be submitted requesting compliance guidance." *Id.* at 7. Colonna's claimed that it did submit a CFR to the Navy to explain the problem, Tr. Vol. 1, 155: 18–22, but the CFR was not produced at trial, and the Navy stated that, to its knowledge, it had never received anything in writing from Colonna's related to the NMD issue. Tr. Vol. 4, 605: 3.

Accordingly, Colonna's cannot now claim monetary damages when it was twice told it should have submitted a CFR so the Navy could work with Colonna's to resolve the dispute. Colonna's has not come forth with evidence sufficient to show that the Navy's failure to either update the NMD or provide Colonna's with performance alternatives pursuant to a CRF breached a specific contractual obligation. Therefore, Plaintiff has not shown that Defendant's actions constituted a material breach of contract under Virginia law. Plaintiff's claim fails.

### vi. Weld Grooming & Over-inspection

#### a. Weld Grooming

Another of Colonna's basis for relief is that the Navy required Colonna's to do additional work during the welding process. Colonna's claims that the Navy directed the excessive grinding of welds and the use of inaccurate weld testing procedures during the availability. Pl.'s Ex. 1 at 41–42; Tr. Vol. 1, 165: 7–19. The evidence presented at trial revealed varying accounts of what the requirements were to grind the welds. Testimony from both sides

indicated that excessive grinding of welds damages the welds' integrity and is not required under the Contract. Tr. Vol. 4, 753: 13–23; Tr. Vol. 2, 334: 3–6. Colonna's contends that the Navy's Quality Assurance ("QA") inspector, Mr. Buford Redd, "imposed an arbitrary standard of grinding welds 'smooth' and making them 'pretty'," a process that fell outside of the contractual requirements. ECF No. 54 at 9; Pl.'s Ex. 1 at 40. The Navy makes the opposite claim, arguing that "Mr. Redd did not require Colonna's to grind welds. To the contrary, he criticized them for it." ECF No. 53 at 17, n.4; J. Ex. 63 at 1. Colonna's contends that *every* weld aboard the SQUALL "had been ground to a smooth finish" in anticipation of Mr. Redd's inspection. *See* Tr. Vol. 2, 440: 23–25; 441: 1–4; Tr. Vol. 3, 460: 20–21. It is unclear, however, pursuant to whose direction the welds were ground to such an extreme.

Colonna's witnesses testified regarding grinding the welds. Mr. William Murray, Jr., Colonna's Director of Quality, testified that he spoke directly with Mr. Redd who instructed Mr. Murray that he wanted "a very pretty, clean weld," and that Mr. Redd's "expectation was that they [the welds] be all bright and shiny, which would actually compromise the weld." Tr. Vol. 2, 483: 1–12. Mr. Murray testified that Mr. Redd told him directly that "he wanted to see them [the welds] 'pretty'." Tr. Vol. 2, 483: 14–17. However, Mr. Murray also testified that he became involved in the issue when Colonna's first received a CAR indicating that Colonna's was not working "to the workmanship standard." Tr. Vol. 3, 480: 18–25. He testified that "we [Colonna's] weren't grinding the welds at the time [Colonna's received the CAR], which is contrary to the way you should be doing it, and that's when we had our first couple of meetings." Tr. Vol. 3, 480: 22–25.

Mr. Murray further stated that when Mr. Redd said he was "looking for a very pretty, clean weld," that Colonna's "normal process was to take a wire brush, brush the weld off, make

sure there was no splatter or a slash and inspect the weld at that point to make and do your first visual inspection." Tr. Vol. 3, 483: 4–8. When asked whether Mr. Redd actually told Mr. Murray that the welds should be ground, the witness testified that "[t]he *inference* was that if we didn't do it [grind the welds], we would see more correction actions." Tr. Vol. 3, 484: 5–10 (emphasis added). He neither testified that Mr. Redd directed Colonna's to grind the welds, nor did he testify that Mr. Redd required every weld aboard the SQUALL be ground "smooth" for appearance sake. Further, Mr. Nelson Britt, Colonna's Resource Manager for the welders, testified that "nobody really" directed the welds be ground, and that "after we [Colonna's] were trying to sell 2 or 3 of the welds and we found out that we couldn't get them sold, [ ] we did what the next step was, was to do what we did to sell the last set of welds, and that's to grind them smooth." Tr. Vol. 2, 425: 25; 426: 1–5. Colonna's own testimony is conflicting.

While Mr. Walker, Colonna's Vice President of Operations, testified that "[t]he direction from Mr. Redd was that they'll [the welds] be ground smooth for appearance and that grinding was a requirement," Tr. Vol. 2, 334: 23–25, 335: 1, Mr. Britt, who actually welded aboard the SQAULL, testified that "*nobody*" directed Colonna's to grind the welds smooth, and that Colonna's did so on its own in an effort to "sell the weld" to Mr. Redd. Tr. Vol. 2, 425: 25; 426: 1–5. Mr. Murray provided similar testimony regarding Colonna's "*inference*" that the welds needed to be ground smooth in order to be sold. Tr. Vol. 3, 484: 5–10 (emphasis added). Mr. Britt testified to being present when Mr. Redd directed the grinding of a weld, although not for appearance sake, and that it was understood the only way Mr. Redd would sign the QA ticket for the welds was if those welds were ground in accordance with his direction. Tr. Vol. 2, 417: 23–25, 418: 3–5.

Significantly, for each weld to be ground there was supposed to be a QA ticket generated.

Tr. Vol. 3, 470: 7–9, 491: 16–20. These tickets became a part of the permanent record for the SQUALL and would indicate whether a weld passed or failed inspection. Tr. Vol. 3, 492: 2–4, 13–21. Mr. Murray was asked whether, in drafting the REA, Colonna's made an effort to go back and look at the QA tickets in order to identify any specific welds Colonna's believed were over-groomed, and he responded, "it could have been done, but was it done? It didn't have to be done because we ground every weld." Tr. Vol. 492: 22–25, 493: 3–6. However, Colonna's stated in its REA that "it is difficult to say for certain that every weld had to be ground, although that is [ ] Colonna's perception." Pl.'s Ex. 1 at 41. Mr. Walker testified that "[l]iterally all the welds were ground," Tr. Vol. 2, 334: 23, but Mr. James Campbell, one of Colonna's welding supervisors, stated that only seventy-five (75) to eighty (80) percent of the welds had excessive grinding. Tr. Vol. 3, 462: 1–2. He further stated that it only took between thirty (30) minutes to an hour to grind a weld, Tr. Vol. 3, 462: 5, while Colonna's REA estimates it took one (1) manhour of grinding to grind (1) foot of weld, Pl.'s Ex. 1 at 42, and Mr. Britt claimed it only took fifteen (15) to twenty (20) minutes to grind a foot of weld. Tr. Vol. 2, 422: 4–6.

Further, grinding is not always an unnecessary procedure. Mr. Britt testified that the grinding process can be used "to either remove a[n] arc strike or porosity or wormhole. It's a number of things that we do. It may be some slack that won't come off by chipping that you may have to grind it off." Tr. Vol. 2, 417: 1–7. Accordingly, an instruction to "grind" a weld alone does not necessarily fall outside of the contractual requirements when grinding can serve a legitimate corrective purpose. For example, Mr. Britt testified that Mr. Redd once requested a weld be ground because he believed it to be "oversized." Tr. Vol. 2, 424: 2–15. He also testified that a welder might take a grinder to the weld on his own accord to make sure it looks nice for inspection, and that the welding supervisors might direct that a weld be ground to correct an

30

imperfection. Tr. Vol. 2, 432: 18–22, 433: 5–16. Other than the single issue which arose related to the "oversized" weld, Mr. Britt testified that he never heard Mr. Redd direct a weld to be ground. Tr. Vol. 2, 438: 16–19. Regarding grinding for appearance, Mr. Britt was asked:

> Q. Is that the type of grinding that you observed onboard the USS Squall, to correct minor deficiencies, or did you note grinding for appearance sake?

> A. We grind it to correct the arc strike or pinhole or something of that nature. But to grind the whole entire weld? *No.*

Tr. Vol. 2, 440: 17–22 (emphasis added).

Mr. Redd testified that "never" in his career did he require anyone grind a weld for appearance sake. Tr. Vol. 4, 748: 5–10. He also testified that "none" of the welds aboard the SQUALL were ground flat to a smooth or shiny finish. Tr. Vol. 4, 748: 22–25, 749: 1–2. In fact, the parties produced a CAR report Mr. Redd issued related to this conflict, which criticized Colonna's because "[a]ll welds have . . . excessive grinding, reducing base material thickness." J. Ex. 63 at 1. Mr. Antwoin Potts, one of Colonna's welding QA inspectors, stated that when looking at welds with Mr. Redd, Mr. Redd might criticize the welds for appearance or workmanship, but Mr. Redd never told him that the welds had to be ground. Tr. Vol. 4, 729: 14–16, 730: 3–5. Further, Mr. Potts stated that if he was able to show Mr. Redd that the weld met the standards for workmanship, Mr. Redd would concur with him and accept the weld. Tr. Vol. 4, 729, 17–23.

The evidence indicates that, at times, Mr. Redd was not satisfied with the appearance or workmanship of a weld, stating after inspecting certain welds that "he was not going to look at anymore welds that look like this." Tr. Vol. 3, 485: 24–25, 486: 1; Pl.'s Ex. 85 at 2. However, testimony also indicates that prior to inspection, the welders might brush the weld to make sure there was no splatter or splash, and that they sometimes did this to make a weld look nice. Tr.

Vol. 3, 483: 4–8; Tr. Vol. 2, 432: 18–22. The evidence also indicates that if a weld failed to meet the standard of workmanship, grinding the weld was appropriate to correct defects or remove imperfections. Tr. Vol. 2, 417: 1–7. Mr. Britt testified that other than the instances he testified to, he was not aware of any Colonna's records that indicated Mr. Redd was requiring welds be ground. Tr. Vol. 2, 436: 2–8.

Accordingly, the Court finds that in an effort to "sell the welds" to Mr. Redd, who had previously criticized welds for not meeting the standards of workmanship, Colonna's welders began grinding welds "smooth" on an "inference," Tr. Vol. 2, 425: 25, 426: 1–5; Tr. Vol. 3, 484: 5–10, something for which Mr. Redd criticized them. *See* J. Ex. 63 at 1. The credibility of the witnesses, and in turn the weight of the evidence, is not determined by the mere number of witnesses testifying to the existence or nonexistence of any fact. 3 O'Malley, *Federal Jury Practice and Instructions*, § 105:01. There is conflicting evidence from Plaintiff's witnesses concerning whether the Navy required excessive grinding of welds. Having weighed the credibility of the witnesses, the Court finds Mr. Redd did not require Colonna's to grind welds to make them "shiny" and "pretty." Plaintiff has not met its burden by a preponderance of the evidence such that the Court can find the Navy required excessive weld grinding beyond the Contract's specifications. Plaintiff has not established that Defendant's actions in this matter constituted a breach of contract under Virginia law and cannot prevail on this claim.

### b. Over Inspection

Colonna's also asserts that when the Navy called for QA inspections, it required Colonna's to utilize Liquid Dye Penetrant Testing ("PT"). Pl.'s Ex. 1 at 39; ECF No. 54 at 10. Colonna's argued that the PT testing was flawed and resulted in over a 50% weld failure rate. Pl.'s Ex. 1 at 40. Plaintiff later re-tested the same welds using Magnetic Particle Testing

("MT"), and Plaintiff received almost a 100% weld passage rate. Tr. Vol. 2, 360: 6–10. In consideration of these results, the Navy permitted continued use of the MT procedure, but Colonna's is seeking damages for the additional work performed as a result of the PT procedure's false readings. Pl.'s Ex. 1 at 39–42. Colonna's Vice President testified that the Navy was permitted to request either PT or MT testing in accordance with the Contract's terms. Tr. Vol. 1, 163: 11–18. Despite the alleged inadequacy of the PT procedure, Colonna's has not come forth with evidence sufficient to show that the Navy breached the Contract by requiring PT testing. On the contrary, the Navy was contractually permitted to utilize either testing method. A request for damages based on this claim is unavailing.

### vii. Additional Management Costs

Colonna's asserts entitlement to $23,325.00 in additional management costs for approximately five-hundred (500) manhours of extra supervision middle and senior managers accrued as a result of the changes detailed in Colonna's REA. Pl.'s Ex. 1 at 64–65. The Contract, however, was fixed-price, and each modification contained release language reading, "[t]he change in the delivery dates and/or price described above is considered to be fair and reasonable and has been mutually agreed upon in full and final settlement of all claims arising out of this modification." J. Ex. 28–48; *see, e.g.*, J. Ex. 28 at 3. Colonna's cannot claim additional management costs absent a finding that the Navy breached the Contract and absent evidence indicating which additional hours correlated to an alleged breach. Such costs should have been incorporated into Colonna's claims for relief under each item. Colonna's has not met its burden of proof on this claim.

### viii. Acceleration & Overtime

In order to avoid liquidated damages, Colonna's claims it was forced to accelerate its

33

work as a result of unrealistic Navy demands. Pl.'s Ex. 1 at 69–70. Colonna's testified to omitting overtime in its bid in order to keep its bid low and win the Contract. Tr. Vol. 2, 245: 23–26, 246: 1–2. It now seeks, on a fixed-price contract that included fix-price modifications, nearly a million dollars in acceleration/overtime damages. Pl.'s Ex. 1 at 71; Tr. Vol. 1, 184: 14–15. Absent a finding that the Navy breached the Contract and absent evidence indicating which overtime hours correlated to an alleged breach, the Court cannot grant Colonna's relief. As the Court has found that Colonna's is not entitled to relief, there is no legal basis upon which to grant Colonna's request for additional overtime compensation. Therefore, the Court finds that Colonna's is not entitled to relief on this claim.

### ix. Disruption & Loss of Efficiency

Colonna's further contends that the United States failed to compensate it adequately for the alleged local and cumulative disruption arising from the numerous contractual modifications. Pl's Ex. 1 at 78; Tr. Vol. 1, 190: 9–19. A "disruption" or "cumulative impact" claim "captures the cost of working less efficiently than planned." *Bell BCI Co. v. United States*, 72 Fed. Cl. 164, 168 (Fed. Cl. 2006). Disruption claims are intended to compensate the effected party for damages suffered "that made its work more difficult and expensive" than anticipated. *U.S. Indus. v. Blake Constr. Co.*, 671 F.2d 539, 546 (D.C. 1982). Colonna's requests $721,209.00 in damages for local and cumulative disruption experienced as a result certain contractual modifications. Pl.'s Ex. 1 at 76; Tr. Vol. 1, 199: 14–25, 200: 1–5. Colonna's also utilized an alternative methodology for calculating disruption referred to as the "Range Method." Pl.'s Ex. 1 at 77. Pursuant to this calculation, Colonna's estimates $1,112,602.50 in disruption damages employing a 20.83% disruption factor. *Id.*; Tr. Vol. 1, 202: 3–8.

The parties agreed that Modifications one (1) through twenty-five (25)[6] included a full release of any costs arising from the changes identified, including disruption. Tr. Vol. 4, 653: 19–24; Tr. Vol. 2, 229: 17–19, 236: 21–25, 237: 1; *see, e.g.,* J. Ex. 3. In Modifications thirty-six (36) to forty-six (46), however, the parties agreed "that the contractor specifically reserves the right to seek cumulative impact" related to the changes, and this language was made retroactively applicable to Modifications twenty-six (26) to thirty-five (35) in Modification thirty-eight (38). *See* J. Ex. 40 at 2; J. Ex. 38–48; Tr. Vol. 2, 257: 8–12. In pricing its disruption claim, Colonna's utilized a 10% total impact or disruption factor, multiplied it by the total manhours it estimates were added to the Contract through Modifications twenty-six (26) to forty-six (46), and multiplied the result by Colonna's base rate of pay, $46.65 per hour. Pl.'s Ex. 1 at 76. The Government argues that "[n]o evidence exists of any contract work that was disrupted beyond that contemplated–and compensated–in the Mods," ECF No. 53 at 19, but conceded in its response to Plaintiff's REA that local and cumulative disruption are recoverable for those claims where entitlement is recognized. J. Ex. 1 at 20. However, the Court cannot grant Plaintiff arbitrary relief premised upon an unsubstantiated and subjective disruption calculation.

Although it is difficult to calculate disruption with certainty, Plaintiff must show that the damages claimed resulted from the cumulative impact of Modifications twenty-six (26) to forty-six (46). Colonna's has not come forward with evidence sufficient to show that the work performed as a result of the applicable modifications actually had the disruptive impact claimed. The bulk of evidence presented focused on whether Colonna's had the contractual right to seek

---

[6] At trial, Colonna's Vice President testified that the parties had fully released any costs associated with Modifications one (1) through twenty-six (26), but Colonna's reserved the right to seek cumulative impact related to Modifications twenty-seven (27) through forty-six (46). However, the language contained in Modification thirty-eight (38) that made the cumulative impact language retroactively applicable states that the change in language actually applied to Modifications twenty-six (26) through thirty-five (35). J. Ex. 40 at 2. At trial, the Government clarified that it was Modifications one (1) through twenty-five (25) that contained the final release language. Tr. Vol. 4, 653: 20–24.

cumulative impact but neglected to show that Colonna's was actually entitled to it. The premise of Colonna's claim is simply that because 63,000 hours of negotiated change work were added to the Contract's base value, the change work "causes a local disruptive effect" such that "[i]t is not unreasonable to assume that at least 10% of the change hours . . . account for loss efficiency." Pl.'s Ex. 1 at 74; *see* Tr. Vol. 1, 198: 20–25. The Court will not make such assumptions. Although disruption need not and often cannot be proven with mathematical certainty, Colonna's has not presented evidence sufficient to show how the Contract work was disrupted as a result of the fixed-price modifications in accordance with the amount claimed. This claim fails.

### x. *Proposal Preparation Costs*

Lastly, Plaintiff seeks $67,508.00 for the "in-house and consulting costs for preparing, submitting, printing, and negotiating the REA." Pl.'s Ex. 1 at 79–80; Tr. Vol. 1, 210: 6–9. Title 48, Code of Federal Regulations, Section 31.205-33 allows a party to seek the costs of "professional and consultant" services but states that "no single factor or any special combination of factors is necessarily determinative" in allowing costs. 48 C.F.R. § 31.205-33(d). Even if the evidence indicates that Colonna's submitted its REA "for the genuine purpose of materially furthering the negotiation process," [7] *Meridian Eng'g Co. v. United States*, 122 Fed. Cl. 381, 420 (Fed. Cl. 2015), the Court has discretion to deny a request for costs. The Court finds that, in light of Plaintiff's failure to recover on the claims outlined in its REA, an award of costs is not appropriate. Accordingly, the Court will not grant Colonna's costs on this claim.

### B. Calculation of Damages

#### i. *Damages for Breach of Contract*

Damages for breach of contract are intended to return the aggrieved party to the position

---

[7] At trial, Colonna's indicated that its in-house counsel costs were accrued prior to the filing of its REA and Colonna's intent in submitting the REA was to foster settlement of its claims. Tr. Vol. 1, 202: 11–14, 211: 11–19.

it would have been absent the breach and are limited to pecuniary loss. *Sunrise Continuing Care*, 671 S.E.2d at 156. Failure to show proof of damages warrants dismissal of the applicable claim. *Id.*

### ii. Applicability of the Modified Total Cost Approach

When a party seeks relief utilizing the "modified total cost method" to calculate damages, it seeks "the total actual costs incurred in performing the contract minus the contractor's bid price or estimated costs." *Youngdale*, 27 Fed. Cl. at 541. Use of the modified total cost method is only condoned "in those extraordinary circumstances where no other way to compute damages [ ] [is] feasible," *Youngdale*, 27 Fed. Cl. at 541 (quoting *Servidone Const. Corp*, 931 F.2d at 862), and it "is highly disfavored by the courts, because it blandly *assumes*—that every penney [sic] of the plaintiff's costs are *prima facie* reasonable." *Id.* The Court has already determined that "every penny" of Plaintiff's costs were *not* reasonable, and as such, it cannot compute damages based on total cost incurred. Accordingly, use of the modified total cost method of calculating damages is not appropriate in this matter.

### iii. The Theory of Cardinal Change

The Theory of Cardinal Change "asks whether a modification exceeds the scope of the contract's changes clause;" more specifically,

> [u]nder established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. *By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.*

*AT&T Commc'ns, Inc.*, 1 F.3d at 1205 (quoting *Allied Materials & Equip. Co.*, 569 F.2d at 563–64) (emphasis added). In order to demonstrate cardinal change, Plaintiff must establish the following features: "(1) a cardinal change requires work materially different from that specified

in the contract, and (2) a cardinal change amounts to an actual breach of contract." *Bell/Heery*, 739 F.3d at 1335. Colonna's argues that "[t]he magnitude in the growth of the Contract alone demonstrates a Cardinal Change" and that the Government "has imposed obligations upon Colonna's far exceeding that which was bargained for when it accepted the contract." ECF No. 54 at 23; *see also* Pl.'s Ex. 1 at 5–15.

Colonna's admitted that it looks for "20 to 30 percent growth" when it bids a contract. Tr. Vol. 2, 239: 22–25. Although the growth work on the SQUALL exceeded this threshold, Plaintiff anticipated modification throughout the availability. Further, Plaintiff has not satisfactorily established that the work performed was materially different from that specified in the Contract. Despite the difficulties encountered, a contract to repair a ship remained a contract to repair a ship, and the modifications indicate that these changes were clearly redressable under the Contract. Had the changes been so profound that they were not redressable, it is unlikely that the parties would have been able to negotiate forty-six (46) bilateral contract modifications. *See Amertex Enterprises, Ltd. v. United States*, 108 F.3d 1392 (Table), No. 26-5070, 1997 WL 73789, at *1 (Fed. Cir. Feb. 24, 1997) (stating that "we agree with the trial court that Amertex waived its cardinal change claim by entering into bilateral modifications") (unpublished). Therefore, the Court finds that a cardinal change has not occurred and rejects application of the theory in this matter.

### iv. Item-by-Item Approach

In employing the traditional "bottom-up" or item-by-item approach to calculating damages, a contractor will analyze the damages incurred on each individual consideration and then add up each item's damages "to reach a true total of damages." *Stender*, 2015 WL 5675304, at *10. The Court finds this is an appropriate method by which to calculate damages,

and Plaintiff is not entitled to any damages.

### C. Quantum Meruit

Count III of Colonna's Complaint is pled in the alternative to Counts I, II, IV, and VI and seeks compensation under the equitable doctrine of quantum meruit. Compl. ¶¶ 53–61. "To avoid unjust enrichment, equity will effect a 'contract implied in law,' requiring one who accepts and receives the services of another to make reasonable compensation for those services." *Po River Water and Sewer*, 495 S.E.2d at 482. However, "[t]he existence of an express contract on the subject in question would impair attempts to establish" the right to recovery on the theory of quantum meruit. *Raymond*, 961 F.2d at 493. The Contract at issue in this litigation is an express, written contract, and Colonna's has presented *no* evidence tending to show the existence of an implied contract of a different nature. Accordingly, the doctrine of quantum meruit is inapplicable in the present action because Plaintiff is attempting to recover for duties expressly included in the Contract and accompanying modifications.

### D. Duty to Disclose Superior Knowledge (Actual or Constructive Fraud)

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to do so with specificity by stating "with particularity the circumstances constituting fraud." Fed. R. Civ. Pro. 9(b). In Count V of its Complaint, Plaintiff merely alleges that the Navy "possessed and did not disclose superior knowledge vital to contract performance." Compl. ¶ 74. Failure to disclose material information when a party is under a duty to do so constitutes common law fraud. *Chiarella*, 445 U.S. 222 at 228. Colonna's specified neither the nature of this "undisclosed" knowledge nor whether the Navy's alleged non-disclosure constituted actual or constructive fraud. Colonna's presented *no* evidence at trial to show that the Navy breached its duty to disclose. Accordingly, this claim is without merit.

## IV. CONCLUSION

For the reasons stated above, the Court finds Plaintiff has not met its burden to establish by a preponderance of the evidence that Defendant breached its Contract.   Accordingly, **JUDGMENT IS AWARDED FOR DEFENDANT**.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED**.

Norfolk, Virginia
December 14 , 2015

Raymond A. Jackson
United States District Judge